# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

NATIONAL CASUALTY
COMPANY,

        **Plaintiff,**

   **v.**                           **1:16-cv-679-WSD**

**FULTON COUNTY, GEORGIA,**

        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Fulton County, Georgia's

Motion for Summary Judgment [35] and Plaintiff National Casualty Company's

Motion for Summary Judgment [36].

## I.  BACKGROUND

This is an insurance coverage dispute between Fulton County, Georgia,

("Fulton County" or the "County") and its insurance carrier, National Casualty

Company ("National") regarding coverage for a number of employment lawsuits

brought by County employees.  The parties dispute whether the insurance policies

at issue provide coverage of the employees' lawsuits and whether the County

properly reported the cases to National in compliance with the policies' notice

requirements.

A.    The Pay Parity Cases

Fulton County was named as a defendant in seven lawsuits and one grievance brought by 316 individual plaintiffs and 22 grievants (collectively referred to as "Plaintiffs") who are current or former County employees (the "Pay Parity Cases").  The majority of the Pay Parity Cases were brought by staff, senior, and supervising attorneys employed in the Public Defender's Office, the Solicitor's Office, the District Attorney's Office, the Child Advocate's Office, and the Superior and State Courts, who alleged that the County failed to pay them "equal pay for equal work," because certain County attorneys were paid more than attorneys in other County offices.  Similar claims were also brought by a group of employees with the Fulton County Sheriff's Office who alleged that the County violated personnel regulations by compensating some groups of deputies differently than others.  (Defendant's Statement of Material Fact [35.2] "DSOMF" ¶ 41).

The Plaintiffs alleged they sustained damages because they were not paid the amount required during the period from July 6, 2013, through July 6, 2015, a period in which National provided insurance coverage to Fulton County.  The Pay Parity Cases all allege breach of contract claims in which the Plaintiffs alleged that Fulton County breached its employment contracts by not paying salaries required

by personnel regulations passed by Fulton County that set forth attorney and other employee pay rates (the "Personnel Regulations"). The Pay Parity Plaintiffs alleged that these regulations constitute a part of their employment contracts with the County. At a mediation in which the County and the Plaintiffs participated on October 1-2, 2015, the Plaintiffs stated that the Pay Parity Cases "are contract claims based on the County's pay parity Personnel Regulations, which <u>Lord</u> and <u>Andrews</u>[1] have held to be part of the written contract between the employees and the County, thereby creating an enforceable claim for damages based on salary disparities." (<u>Id.</u> ¶ 43). The County does not dispute that the Personnel Regulations are part of the County's contract with the Plaintiffs.

### 1. The Lord Case

In 2006, Georgia Lord and 22 other Judicial Staff Attorneys employed by the Superior and State Courts of Fulton County filed a grievance against the County claiming they were unfairly paid less than the staff attorneys employed by the County Attorney's Office. <u>See</u> <u>Fulton County v. Lord</u>, 746 S.E.2d 188 (Ga. Ct. App. 2013) ("<u>Lord</u>"). When the grievance was denied in 2009, the plaintiffs in <u>Lord</u> commenced arbitration of the dispute. <u>Id.</u> at 192. The arbitrator held a

---

[1] These are two Pay Parity Cases which are discussed in more detail in the next section of this Order.

hearing in June 2011, and issued a final decision on December 29, 2011, awarding

the plaintiffs $4.3 million in back pay, plus prejudgment interest. Id.[2] Fulton

County appealed the award. The Court of Appeals of Georgia affirmed the award

on July 8, 2013. Id.[3] As of August 3, 2015, 15 Lord plaintiffs continued to assert

claims for back pay that were allegedly not yet resolved by payments pursuant to

the arbitration order. (Plaintiff's Statement of Material Facts [36.1] ("PSOMF")

¶ 8).

---

[2]    Fulton County does not contend that its insurance policies with National cover the entire award and judgment in Lord. Fulton County seeks indemnification for the portion of the settlement paid to the Lord plaintiffs for damages occurring during the period covered by the Policies.

[3]    The Georgia Court of Appeals in Lord addressed limited issues, including whether a back pay claim was barred by sovereign immunity. In finding sovereign immunity was not a bar, the court observed:

> Putting aside whether the County's personnel regulation specifically allowing for arbitration of its employees' pay grievances in and of itself constituted a waiver of sovereign immunity, the law clerks' claim for back pay here sounds in contract and, therefore, is not barred by sovereign immunity. Indeed, there is a definite contractual relation "between every employee and employer whether the employee is a public officer or not." . . . [T]o bar government employees from recovering pay for services they performed by allowing their government employer to claim immunity "would violate the prohibition against the impairment of a contract which is found in both the State and Federal Constitutions."

Lord, 746 S.E.2d at 194 (internal citations omitted).

2. The Andrews Case

Andrews v. Fulton County ("Andrews") involved employees assigned to the Office of the Fulton County Public Defender. Fulton Cty. v. Andrews, 773 S.E.2d 432 (Ga. Ct. App. 2015). It began with a grievance filed against the County in January 2012. Id. at 435. The County denied the grievance and on November 5, 2012, the plaintiffs filed their pay parity action against the County. The Andrews plaintiffs alleged that the County's Personnel Regulations were part of their employment contract and, as a result, the County was contractually required to pay public defenders the same compensation received by attorneys in the County Attorney's Office. Id. at 476-77. They moved for summary judgment for underpayment of wages since 1987.

On September 24, 2014, the Andrews court granted the plaintiffs' motion for summary judgment finding the County was required to pay County attorneys and public defenders at the same rate. Id. at 434. The Andrews court stated: "The Personnel Regulations form an employment contract between Plaintiff and the County . . . [and] Georgia case law recognizes Fulton County's civil service regime, created by the Legislature pursuant to the [Civil Service Act of 1982], as a legally enforceable employment contract." (PSOMF ¶ 19). On June 11, 2015, the

Georgia Court of Appeals affirmed the trial court's grant of summary judgment.

Andrews, 773 S.E.2d 432.

### 3. Others Cases

Other cases and grievances have been brought by lawyers claiming their employment contracts with Fulton County were breached because they were not paid at the rate required by the Personnel Regulations:

- On September 19, 2012, 34 solicitor's office attorneys sued the County in Manchel v. Fulton County ("Manchel"), claiming breach of contract for not paying them the rate required by the Personnel Regulations. ([1.3]). Twelve plaintiffs were added on July 14, 2014. (PSOMF ¶ 12).

- On October 16, 2012, a group of Judicial Staff Attorneys assigned to the Fulton County State Court sued the County in DeFoor v. Fulton County ("DeFoor"), claiming breach of contract by not paying them the rate required by the Personnel Regulations. ([1.4]).

- On November 16, 2012, 15 Fulton County Office of the Child Attorney lawyers sued the County in Bigelow v. Fulton County ("Bigelow"), claiming breach of contract by not paying them the rate required by the Personnel Regulations. ([1.6]).

- On October 25, 2013, 100 assistant district attorneys filed their complaint in Allen v. Fulton County ("Allen"). ([1.7]). Seven plaintiffs were added in May 2014. (PSOMF ¶ 15). These assistant district attorneys claim breach of contract by not paying them the rate required by the Personnel Regulations.

- Benson v. Fulton County involved employees of the Fulton County Sheriff's Office ("Benson"). ([1.8]). Benson was filed on August 13, 2014. The plaintiffs in Benson also claimed breach of contract by not paying them the rate required by the Personnel Regulations.

- On July 28, 2015, 22 Public Defenders, led by Tosif Chouhan, asserted a pay parity breach of contract grievance against the County ("Chouhan"). (PSOMF ¶ 11). They claimed the County was not paying them at the rate required by the Personnel Regulations.[4]

When the trial court ruled in favor of the Andrews plaintiffs, the Plaintiffs in the above actions, and the County, agreed to stay the Pay Parity Cases until the appeal in Andrews was concluded. The appeal in Andrews was decided on June 11, 2015.

B.     National's Policies

Two liability insurance policies issued to Fulton County by National are at issue in this action. The first is a Retained Limit Liability Insurance Policy for Public Entities, policy number PGO0000107, providing coverage for the period July 6, 2013, to July 6, 2014 (the "2013 Policy"). ([1.1]). The 2013 Policy provides "employment practices wrongful act" coverage limited to $7 million per occurrence, and an aggregate policy limit of $7 million.[5] The second policy is the 2014 renewal of the 2013 Policy, policy number PGO0000182. ([1.2]). It provides liability coverage to the County for the period July 6, 2014, to July 6, 2015 (the "Renewal Policy"), including coverage for "employment practices

---

[4]     The Plaintiffs in all of the Pay Parity Cases are represented by Parks, Chesin & Walbert, P.C.

[5]     The policy provides a $2 million retention. ([1.1] at 6).

wrongful act[s]." [6]  The "employment practices wrongful act" coverage under the

Renewal Policy is limited to $10 million per occurrence, with an aggregate policy

limit of $10 million.  (Id. at 6).[7]

The relevant coverage terms are essentially the same for both policies.  The

"employment practices liability" coverage in the Policies is at issue in this action.

The policy provides:

> 3.  EMPLOYMENT PRACTICES LIABILITY
>
> We will pay on your behalf "loss" that you become legally obligated
> to pay on account of any "employment practices wrongful act" you
> committed during the "policy period."

([1.1] at 8).  "Loss" is defined for "employment practices wrongful act" coverage

purposes as:

> the amount [that] . . . (ii) is against an "insured" for any . . .
> "employment practices wrongful act" . . . including but not limited to
> damages (including punitive or exemplary damages, if and to the
> extent that such punitive or exemplary damages are insurable under
> applicable law), judgments, settlements, pre-judgment and post-
> judgment interest.  "Loss" shall include "defense costs."

([1.1] at 13; [1.2] at 13).

The Policies define "employment practices wrongful act" as:

---

[6]      The 2013 Policy and the Renewal Policy are sometimes referred to as the
"Policies."

[7]      It is also subject to a $2 million retention.

any employment-related act, omission, policy, practice or representation of the "insured" directed at or against any natural person, occurring in whole or in part at any time, including any:

. . .

2. Breach of any express or implied covenant;

. . .

9. Failure or refusal to advance, compensate, employ or promote; [or]

. . .

12. Any other employment-related act, omission, policy, practice, representation or relationship in connection with any "insured" at any time.

([1.1] at 12; [1.2] at 12).

The Policies state that National shall not be liable for or pay the loss for any:

A. Obligation in which any insured may be held liable under any applicable workers' compensation law, unemployment compensation law, disability benefits law, or any similar law;

. . .

H. Liability arising out of [the County's] "wrongful act" for gain, profit, or advantage to which you are not legally entitled;

. . .

S. Liability arising out of, based upon or attributable to any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal, state or statutory law or common law; provided, that this Exclusion S. shall not apply to any claim for retaliation.

([1.1] at 15-16, 18-19; [1.2] at 15-16, 18-19).

The Policies contain three relevant notice requirements:

1.    [The County] must notify [National] as soon as practicable of a[n] . . . "employment practices wrongful act" . . . which may result in a "claim" or suit that may exceed fifty percent (50%) of your "retained limit." To the extent possible, any such notice should include the nature and location of any injury or damage arising out of the . . . "employment practices wrongful act."

2.    If a "claim" is made against any "insured," [the County] must:

    a.    Immediately record the specifics of the "claim," including the summons, complaint, and any other legal papers if a civil proceeding has been commenced, and the date [the County] received such specifics; and

    b.    Notify [National] as soon as practicable.

. . . .

5.    Special Serious Claims Reporting Requirements

    [The County] must provide [National] with written notice as soon as practicable of all . . . "employment practices wrongful acts" or "claims" of which [the County] become[s] aware which involve:

    a.    In [the County's] judgment or the judgment of [the County's] defense counsel, [the County] believe[s] [its] exposure exceeds or may exceed fifty percent (50%) of the "retained limit"; [or]

    b.    Any demand or demands that equal or exceed fifty percent (50%) of the "retained limit."

([1.1] at 20; [1.2] at 20).

C.    Notice to National

Two County offices were responsible for handling the County's defense to the lawsuits: The County Attorney's Office and the Risk Management Department ("Risk Management").  Risk Management was responsible for reporting the Pay Parity Cases to the County's insurers, including National.  (PSOMF ¶ 27).  The County Attorney's Office defended the County in the litigation.  The County communicated with its insurers through the Willis Group, which acted as the broker for the County in connection with the policy applications and was responsible for reporting information about the claims to the County's insurers.

In 2012, Denise McHam-Pinto ("Pinto") became the assistant risk manager in Risk Management, was assigned to all of the Pay Parity Cases, and was responsible for monitoring the Pay Parity Cases and entering notes about the cases in Risk Management's claim tracking system.  (PSOMF ¶ 31).  On July 9, 2013, three days after the 2013 Policy's effective date, Pinto prepared and sent a Risk Management Memo to the Willis Group to accompany the files for the DeFoor, Andrews, Bigelow, and Manchel lawsuits.  The memo stated:

> The issues most likely fall within the reporting period of our expiring carrier, C.V. Starr. . . . The Risk Manager does not view these matters as falling within the purview of our new excess carrier.  Mr. Morris and I have discussed these related claims and ask that you review them and direct the [Willis Group's] Claims Advocate Group on reporting to ensure accuracy.

(PSOMF ¶ 31).

On November 6, 2013, Pinto sent another memo to the Willis Group about the Allen claim. The same day, Pinto created a note in the County's claim system about Allen, stating: "Multiple plaintiffs (108) present claim alleging pay disparity that back dates to date of hire for each named plaintiff." (Id. ¶ 33). She followed up on December 4, 2013, stating: "The trail/appeal [sic] court in other matters has paved way to allow case to continue and perhaps successfully for pltfs on liability." (Id. ¶ 34).

Sometime between February and March 11, 2015, Pinto drafted another memo entitled "Risk Management Information Response to Carrier – Pay Parity Cases." ([37] at 44). In it Pinto reported that on February 12, 2015, the DeFoor plaintiffs made a settlement demand of $468,331.88. The memo stated further: "We are in the process of performing our own back pay calculations . . . . High likelihood matter will fall below SIR." ([37] at 44). The memo stated further that, in Andrews, "no specific damages amount nor settlement demand [has been] presented," the County might consider engaging a damages expert pending the Georgia Court of Appeals' review of liability, and that the case "could reach upwards of 4 million dollars based on how plaintiff's counsel calculated damages in prior litigation." (Id.). In evaluating the Bigelow case, the memo stated that

"[n]o damages computations or demands made" and that "[a]llegations and arguments are same as in other cases."  (Id. at 45).  Regarding Manchel, the memo stated that "[a]llegations and claims are the same."  (Id.).  The memo noted that "Fulton [County] gave notice to any and all potential carriers."  (Id.).  At this point, the County had not yet tendered Manchel to National under the County's coverage.

The County relied upon the Willis Group to report claims to its insurers.  On July 31, 2013, the Willis Group reported DeFoor, Manchel, Andrews, and Bigelow to AIG and Clarendon, both excess insurers whose coverage was in effect from October 5, 2002 through June 6, 2007.  ([37] at 59).  The Willis Group did not give National notice of these four matters.

The Benson plaintiffs asserted their grievance on April 6, 2012.  On December 16, 2013, the County's Risk Department noted that the Benson grievance had "[s]trong [p]otential" for litigation.  The Willis Group did not notify National of the Benson grievance until March 9, 2015.  On July 27, 2015, the County reported to National the Andrews, Allen, Bigelow, DeFoor, Lord, and Manchel matters.

D.    Underwriting the Policies

Civic Risk Underwriting Managers ("Civic Risk") specializes in underwriting excess liability for governmental entities and acted as the

underwriting managers for National on the 2013 Policy and the Renewal Policy. The County applied for these Policies through the Willis Group, which submitted the applications to Civic Risk.  Civic Risk reviewed and evaluated the applications, but did not provide copies of the applications to National.  When the applications were submitted, Fulton County gave loss runs to Civic Risk showing its loss history.[8]  The runs were generated by the County's previous liability carriers and from the County's internal claims system (the "Internal Runs").  The Internal Runs identified the <u>Allen</u>, <u>Andrews</u>, <u>Bigelow</u>, <u>Defoor</u>, and <u>Manchel</u> cases and claims. ([34.8] at 4; [34.16] at 11-12, 14, 37, 40; [34.18] at 3-5).  The Internal Runs did not identify <u>Benson</u> even though the <u>Benson</u> grievance was filed on April 6, 2012, and the lawsuit was filed on August 13, 2014.  The Internal Runs did not identify <u>Chouhan</u>, because the <u>Chouhan</u> grievance was not asserted until July 28, 2015. ([36.5]).

In a July 30, 2015, email from Civic Risk underwriter Kathleen Adamson to Amy Coryer Miller, an adjuster for National, during the course of National's claims investigation in 2015, confirmed that Ms. Adamson had "gone through my Files to locate any references to Pay Parity Claims" and had found "that there were

---

[8]     Loss runs list claims made and paid to give the underwriter information about an applicant's claim history.

Pay Parity Claims, including the Jernigan-Andrews Claim, on the Loss Runs that I received with my initial Submission – I just did not feel a concern about them at that time." (DSOMF ¶ 26).

The Internal Runs submitted for the 2014 renewal showed a $4.9 million "pay disparity claim" payment. (Adamson Dep. Tr. [34.1] at 75:22-25). When underwriting the 2014 renewal, Ms. Adamson reviewed the Internal Runs for the other pay disparity claims and saw that "some were there." (DSOMF ¶ 33). A document called the "Civic Risk Rating Workbook" ("Workbook") contained a category entitled "losses greater than 50% of the retained limit/attachment point." ([34.25] at 2). Within the section various of the Pay Parity Cases were listed.[9] After a brief description of the claims, the Workbook notes that "Ken Scroggins feels that coverage should potentially be found under our Policy." (Id.). Ken Scroggins was a manager in National's claim department.

E.    National's Denial of Coverage

On August 20, 2015, National denied coverage for the Pay Parity Cases. Despite the denial, Fulton County notified National that it planned to try to resolve the Pay Parity Cases through mediation, and invited National to participate in the

_____

[9]    The record does not identify the specific Pay Parity Cases listed in this category.

mediation.  On September 24, 2015, National reiterated its denial of coverage and refused to participate in the mediation.  The mediation was conducted on October 1-2, 2015, and, as a result, Fulton County and the Plaintiffs agreed to settle all of the Pay Parity Cases for the aggregate amount of $18,362,100 (the "Settlement Amount").

On January 19, 2016, Fulton County requested National to indemnify it for the Settlement Amount.  National declined, reiterating that the Policies did not cover the payment.

F.     Procedural History

On March 3, 2016, National filed its Complaint for Declaratory Judgment [1] seeking a declaration that (1) the Pay Parity Cases are not covered by the Policies; (2) the Pay Parity Cases are excluded by the Policies; (3) if covered, Fulton County breached its coverage conditions (a) by failing to give timely notice of the Pay Parity Cases and (b) by failing to disclose the Pay Parity Cases when it applied for the Policies; and (4)  Fulton County made misrepresentations or omissions regarding the Pay Parity Cases when it applied for the Policies and thus the coverage of the cases is void.  ([1] ¶¶ 51-79).

On June 1, 2016, Fulton County filed its Answer and Counterclaim [9].  In it, the County (1) seeks a declaratory judgment that the underlying Pay Parity

Cases are covered by the 2013 Policy and Renewal Policy, and (2) asserts a claim for breach of contract for failing to cover the cases and claims. ([9] at 29-30).

On April 28, 2017, Fulton County filed its Motion for Summary Judgment. ([35]). The County contends that the undisputed evidence shows that (i) the Pay Parity Cases are covered by the Policies as a "loss" arising out of an "employment practices wrongful act," (ii) the policy exclusions cited by National do not apply, (iii) the County satisfied all of the conditions precedent to coverage, and (iv) including by complying with the notice requirements no information was omitted or misrepresented to National by the County during the application and underwriting process.

On April 28, 2017, National also filed a Motion for Summary Judgment ([36]). National argues the undisputed evidence is that (i) the Pay Parity Cases are not covered by the Policies; (ii) even if they are, they are excluded from coverage; and (iii) coverage is not required because the County failed to provide timely notice of the claims and cases. ([37.16]).

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard

"Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law." Ahmed v. Air France-KLM, 165 F. Supp. 3d 1302, 1309 (N.D. Ga. 2016); see Fed. R. Civ. P. 56. "An issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" W. Grp. Nurseries, Inc. v. Ergas, 167 F.3d 1354, 1360 (11th Cir. 1999) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id. at 1361 (quoting Anderson, 477 U.S. at 248).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying [materials] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The movant[] can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof." Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1281-82 (11th Cir. 1999). The moving party need not "support its motion with affidavits or other similar materials *negating* the opponent's claim." Celotex, 477 U.S. at 323. Once the moving party has met its initial burden, the nonmoving party must demonstrate that

summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. <u>Graham</u>, 193 F.3d at 1282. The nonmoving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." <u>Id.</u> "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson</u>, 477 U.S. at 247-48.

"If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Apcoa, Inc. v. Fid. Nat. Bank</u>, 906 F.2d 610, 611 (11th Cir. 1990) (internal quotation marks omitted) (quoting <u>Anderson</u>, 477 U.S. at 250). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007) (internal quotation marks omitted) (quoting <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)); <u>cf.</u> <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002) (a party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such

that reasonable people could not arrive at a contrary verdict") (quoting

Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997) (internal

quotation marks omitted)).

"At the summary judgment stage, facts must be viewed in the light most

favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts." Scott, 550 U.S. at 380. "When opposing parties tell two different stories,

one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment." Id. "[C]redibility determinations, the

weighing of evidence, and the drawing of inferences from the facts are the function

of the jury." Graham, 193 F.3d at 1282. "The nonmovant need not be given the

benefit of every inference but only of every reasonable inference." Id.

> Rule 56(c) mandates the entry of summary judgment, after adequate
> time for discovery and upon motion, against a party who fails to make
> a showing sufficient to establish the existence of an element essential
> to that party's case, and on which that party will bear the burden of
> proof at trial. In such a situation, there can be "no genuine issue as to
> any material fact," since a complete failure of proof concerning an
> essential element of the nonmoving party's case necessarily renders
> all other facts immaterial.

Celotex, 477 U.S. at 322-23; see also Freeman v. JPMorgan Chase Bank N.A.,

675 Fed. App'x 926, 931 (11th Cir. 2017) (same); Herzog v. Castle Rock Entm't,

193 F.3d 1241, 1247 (11th Cir. 1999) ("If the non-movant in a summary judgment

action fails to adduce evidence which would be sufficient, when viewed in a light most favorable to the non-movant, to support a jury finding for the non-movant, summary judgment may be granted.").

"Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist." 3D Medical Imaging, Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017). "Rather, '[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.'" Id. (quoting Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 538-39 (5th Cir. 2004)). "The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." S. Pilot Ins. Co. v. CECS, Inc., 52 F.Supp.3d 1240, 1242–43 (N.D. Ga. 2014).

B.    Insurance Contract Interpretation under Georgia Law

"Insurance in Georgia is a matter of contract and the parties to the contract of insurance are bound by its plain and unambiguous terms." Hurst v. Grange Mut. Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996); see Yeomans & Assoc. Agency,

Inc. v. Bowen Tree Surgeons, Inc., 618 S.E.2d 673, 677 (Ga. Ct. App. 2005) ("[A]n insurance policy is simply a contract, the provisions of which should be construed as any other type of contract.").

When language in the insurance policy "is explicit and unambiguous, the court's job is simply to apply the terms of the contract as written, regardless of whether doing so benefits the carrier or the insured." Georgia Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 424 (Ga. 2016); see Donaldson v. Pilot Life Ins. Co., 341 S.E.2d 279, 280 (Ga. Ct. App. 1986) ("Where the language fixing the extent of coverage is unambiguous, . . . and but one reasonable construction is possible, this court must enforce the contract as written."). "[T]he plain meaning of the terms must be given full effect without straining to extend coverage where none was contracted or intended." State Farm Fire & Cas. Co. v. Bauman, 723 S.E.2d 1, 3 (Ga. Ct. App. 2012). "[A]n insurance company is free to fix the terms of its policies as it sees fit, so long as such terms are not contrary to law." Henning v. Cont'l Cas. Co., 254 F.3d 1291, 1295 (11th Cir. 2001) (internal quotation marks omitted) (quoting Cont'l Cas. Co. v. H.S.I. Fin. Servs., Inc., 466 S.E.2d 4, 6 (Ga. 1996)).

If the terms of the policy are ambiguous, "the statutory rules of contract construction [are] applied." Pomerance v. Berkshire Life Ins. Co. of Am., 654

S.E.2d 638, 640 (Ga. Ct. App. 2007). Ambiguities in the policy are "strictly construed against the insurer as the drafter of the document." Federated Mut. Ins. Co. v. Ownbey Enterprises, Inc., 627 S.E.2d 917, 921 (Ga. App. Ct. 2006); see Giddens v. Equitable Life Assur. Soc. of U.S., 445 F.3d 1286, 1297 (11th Cir. 2006) ("[W]hen a policy is ambiguous, or is capable of two reasonable interpretations, it is construed in the light most favorable to the insured and against the insurer."). "[A] word or a phrase is ambiguous when it is of uncertain meaning and may be fairly understood in more ways than one." Ownbey Enterprises, 627 S.E.2d at 921 (citation and internal quotation marks omitted); see Bogard v. Inter-State Assur. Co., 589 S.E.2d 317, 318 (Ga. Ct. App. 2003) ("Under Georgia law, an insurance contract is considered ambiguous only if its terms are susceptible to two or more reasonable interpretations."). "The rule that an insurance policy will be interpreted liberally in favor of the insured and strictly against the insurer, applies only if the language of the policy is ambiguous after application of other principles or canons of interpretation . . . and only if the ambiguity cannot otherwise be resolved." 16 Williston on Contracts § 49:16 (4th ed. May 2017 Update); see Hays v. Georgia Farm Bureau Mut. Ins. Co., 722 S.E.2d 923, 926 (Ga. Ct. App. 2012).

"[T]he interpretation of an insurance policy, including the determination and resolution of ambiguities, is a question of law for the court to decide." Giddens, 445 F.3d at 1297 (citing O.C.G.A. § 13-2-1); see Pomerance, 654 S.E.2d at 640.

## III.  DISCUSSION

### A.  Coverage of the Pay Parity Cases

The Policies provide that National will pay for a "'loss' that [the County] become[s] legally obligated to pay on account of any 'employment practices wrongful act' [the County] committed during the policy period."  ([1.1] at 8). "Loss" is defined as:

> the amount [that] . . . (ii) is against an "insured" for any . . . "employment practices wrongful act" . . . including but not limited to damages . . ., judgments, settlements, pre-judgment and post-judgment interest.  "Loss" shall include "defense costs."

([1.1] at 13; [1.2] at 13).

The Court examines first whether the underpayment of compensation to the Plaintiffs is an "employment practices wrongful act," within the meaning of the Policies.  An "employment practices wrongful act" is defined in the Policies as:

> any employment-related act, omission, policy, practice or representation of the "insured" directed at or against any natural person . . . including any:
>
> . . .
> 2.  Breach of any express or implied covenant;
>
> . . .

9.  Failure or refusal to . . . compensate; [or]

. . .

12.  Any other employment-related act, omission, policy, practice, representation or relationship in connection with any "insured" at any time.

([1.1] at 12; [1.2] at 12).  The plain terms of this definition encompasses the Pay Parity Cases.  Plaintiffs in all of the Pay Parity Cases allege the failure to pay compensation due to them is an employment related act, policy, or practice directed at natural persons, in this case employees.  In the list of acts that fall within the definition of "employment practices wrongful act[s]" is the "[b]reach of any express or implied covenant," a "[f]ailure or refusal to . . . compensate" or "[a]ny other employment-related act, omission, policy, [or] practice."  This would include failure to compensate as required by the Fulton County Personnel Regulations.

The Georgia Court of Appeals' decision in Andrews is helpful in determining if the underpayment of wages as alleged here is covered under the Policies.  The Andrews court held that the failure to pay the required compensation to public defenders in Fulton County is a breach of the contract the County entered into with lawyers performing various functions.  It specifically held that the Personnel Regulations' pay rates for attorneys in Fulton County are a product of the Civil Service Act of 1982, and are thus legally enforceable contracts.

Despite the language of the Policies themselves and the guidance in Andrews, National argues that Georgia courts have held that there is no coverage for a breach of contract because liability policies are intended to insure against risks grounded only in tort.  ([37.16] at 17).  National relies on Fidelity Bank v. Chartis Specialty Ins. Co., No. 1:12–CV–4259–RWS, 2013 WL 4039414 (N.D. Ga. Aug. 7, 2013), for the proposition that amounts paid by an insured for a breach of contract are uninsurable under Georgia law.  National's reliance on this case is misplaced.

In Chartis Specialty, this Court considered coverage provided under the plaintiff bank's "Management and Professional Liability for Financial Institutions" policy.  The policy covered "any 'Wrongful Act' of the Insured in the rendering of or failure to render 'Professional Services.'"  Id. at *1.  The policy defined "Wrongful Act" as "any actual or alleged breach of duty, neglect, error, misstatement, omission or act by the Company."  Id.  The bank was sued by its customers in a class action lawsuit claiming the fee that the bank charged its customers for overdrafts amounted to a usurious interest charge in violation of Georgia law.  The Chartis Specialty court "could not locate Georgia case law that speaks to th[e] issue" whether the policy covered violations of Georgia's usury law, id. at *3, and refused "to announce a 'new' Georgia rule," id. at *4.  The court

thus declined to hold that Georgia law precluded coverage for restitution damages. It held only that the policy exclusion that excluded disputes involving fees and commissions applied and excluded coverage. Id. at *4. National relies on *dicta* in the Chartis Specialty decision in which the court noted that other states have a rule that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired. Id. at 3 (collecting cases from California, Pennsylvania, Illinois, Arizona, New York, and Texas). The Chartis Specialty court simply declined to find such a bright-line rule under Georgia law on the facts in the Chartis Specialty case. See also Greater Cmty. Bancshares, Inc. v. Fed. Ins. Co., No. 4:14-CV-0266-HLM, 2015 WL 10714012, at *9 (N.D. Ga. Feb. 9, 2015), aff'd, 620 F. App'x 817 (11th Cir. 2015) (rejecting that Chartis Specialty supports that amounts paid by an insured amounting to restitution are uninsurable under Georgia law).

The other Georgia cases cited by National do not support a general rule that breach of contract damages are uninsurable. National cites a variety of cases construing general contractors' standard commercial general liability ("CGL") policies. See McDonald Const. Co. v. Bituminous Cas. Corp., 632 S.E.2d 420 (Ga. Ct. App. 2006); Custom Planning & Dev., Inc. v. Am. Nat. Fire Ins. Co., 606 S.E.2d 39 (Ga. Ct. App. 2004); Standard Contractors, Inc. v. Nat'l Tr. Ins. Co.,

No. 7:14-CV-66 HL, 2014 WL 4809002 (M.D. Ga. Sept. 26, 2014), vacated, No. 7:14-CV-66 (HL), 2014 WL 12701205 (M.D. Ga. Dec. 8, 2014). Those courts have held that a contractor's standard CGL policy is "not intended to protect a contractor from economic loss when a product or completed work is not to the customer's satisfaction or when a contractor must repair or replace an element of his own work which has been damaged in order to comply with his contractual obligations to the customer." Mass. Bay Ins. Co. v. Sunbelt Directional Drilling, Inc., 2008 WL 8167708 at *3 (N.D. Ga. Feb. 14, 2008) (citing McDonald Constr. Co., Inc. v. Bituminous Cas. Corp., 632 S.E.2d 420 (Ga. Ct. App. 2006)). These cases stand for the "settled notion that CGL coverage generally is intended to insure against liabilities to third parties for injury to property or person, but not mere liabilities for the repair or correction of the faulty workmanship of the insured." Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co., 746 S.E.2d 587, 591 (Ga. 2013). These cases do not support that, in Georgia, damages resulting from a breach of contract are not insurable losses under "employment practices wrongful acts" clauses, especially where, as here, "breaches of express or implied covenants" and a "failure or refusal to . . . compensate" are expressly covered.

Georgia law directs courts interpreting insurance policies to ascertain the intention of the parties by examining the contract as a whole.  Ryan v. State Farm Mut. Auto. Ins. Co., 413 S.E.2d 705, 707 (Ga. 1992).  A court must first consider "the ordinary and legal meaning of the words employed in the insurance contract."  Id.  The Policies cover losses due to the "breach of express or implied covenants."  Black's Law Dictionary defines "covenant" as "[a] formal agreement or promise, usu. in a contract or deed, to do or not do a particular act."  Black's Law Dictionary at 443 (10th ed. 2014).  "Express covenant" is defined as "[a] covenant created by the words of the parties."  Id.  The plain language in the coverage provisions is required to be given meaning.  St. Paul Mercury Ins. Co. v. FDIC, 774 F.3d 702, 708 (11th Cir. 2014) ("Pursuant to Georgia's rules of contract construction, the construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part.").  A plain language reading of the Policies leads to the reasonable conclusion that the County's employment agreements are a "formal agreement" that was "created by the words of the parties," and thus, covered under the Policies.

The further plain language of the Policies also provides for coverage of a "failure or refusal to compensate."  The basic claim in the Pay Parity Cases is the

County's failure to compensate at the required levels. The intent of the parties to the Policies to create broad coverage of claims for employment acts is reflected in paragraph 12 of "employment practices wrongful act" provision. After specifying particular acts covered, the parties agreed that the employment practices wrongful act provision applied to "[a]ny other employment-related act, omission, policy, practice, representation or relationship in connection with any 'insured' at any time." ([1.2] at 12). The conclusion is inescapable that the employment practices wrongful acts coverage provision applies here.

This conclusion is also compelled by looking to the Policies' exclusions. Exclusion B excludes coverage for "'[p]ersonal and advertising injury' arising out of a breach of contract or agreement." ([1.1] at 15). Exclusion B is not necessary if the Policies did not cover any contract breaches. National's interpretation that damages for breach of contract actions are not covered would render Exclusion B meaningless. Such an interpretation is disfavored in Georgia. See ALEA London Ltd. v. Woodcock, 649 S.E.2d 740, 745 (Ga. Ct. App. 2007) ("[i]t is well established that a court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless").

National argues that its position would not render meaningless the inclusion of "breach of express or implied covenants" because "many" of the express

covenants between the Plaintiffs and the County in the Personnel Regulations are covered, but the promise to pay is not. National cites the County's obligations to provide its employees with vacation, sick, personal and holiday leave; to provide certain employees with tenured employment; and the right to appeal for employees who are suspended, dismissed, demoted or disciplined. National concedes that "[i]f the County breaches such covenants and an employee seeks damages for such breach, the Policy potentially provides coverage." ([45] at 5). National fails to show how those express covenants differ materially from the covenant to pay employees in accordance with the Personnel Regulations. Applying Georgia's well-settled principles of contract interpretation, this Court finds that the breach of contract claims raised in the Pay Parity Cases are covered by the Policies.

National next relies on authority from other jurisdictions to support its position that an insured's breach of contract is not covered by a liability policy. Those cases are distinguishable. For example, <u>Baylor Heating & Air Conditioning, Inc. v. Federated Mut. Ins. Co.</u>, involved a comprehensive general liability policy which stated that the insurer would pay "all sums which you become legally obligated to pay as damages arising out of any claim . . . caused by any *negligent* act, error or omission in the 'administration' of your 'employee benefit programs.'" 987 F.2d 415, 416 (7th Cir. 1993) (emphasis added). Baylor, the

insured, was found to have breached its collective bargaining agreement by ceasing payments to a pension fund. In finding for the insurer, the court's analysis turned on the word "negligent" in the coverage language. Id. at 419-20 ("The Fund was awarded amounts owed pursuant to the collective bargaining agreement, not damages for negligence, and these payments are not covered by Baylor's policy."). The Policies' coverage provisions here do not limit coverage to only negligent acts.

National next argues the Policies' coverage provisions do not cover contract breaches because a breach of contract does not "arise from" a wrongful act. National relies on a line of cases outside of Georgia holding that damages from the breach of a contractual obligation are not covered because they do not arise from— or were not caused by—a wrongful act. See American Casualty v. Union Welfare Fund, 942 P.2d 172 (Nev. 1997) ("The refusal to pay an obligation simply is not the cause of the obligation, and the international trustees' wrongful act in this case did not result in their obligation to pay; their contract imposed on them the obligation to pay."); Newman v. XL Specialty Ins. Co., No. C-1-06-781, 2007 WL 2982751, at *4 (S.D. Ohio Sept. 24, 2007) ("Courts have consistently held that there is no wrongful act involved in a breach of contract claim as the claim arises out of the legal and voluntary action of creating a contract."). National does not explain, however, how the failure to pay Plaintiffs at the rates to which there are

entitled is not an "employment-related act, omission, policy, [or] practice" of the County.

Finally, finding that the Pay Parity Cases are covered under the Policies does not offend the policy rationale employed by some courts and relied upon by National.  See Waste Corp. of Am. v. Genesis Ins. Co., 382 F. Supp. 2d 1349, 1354 (S.D. Fla. 2005), aff'd, 209 F. App'x 899 (11th Cir. 2006) ("Deciding whether to read breach of contract coverage into the insuring agreement should be determined against the backdrop of the strong public policy against insuring such breaches."); Baylor, 987 F.2d at 420 ("We dare not imagine the creative legal theories treading just short of malpractice and frivolity that could seek to transform contractual obligations into insured events"); August Entm't, Inc. v. Philadelphia Indem. Ins. Co., 52 Cal. Rptr. 3d 908, 911 (Cal. Ct. App. 2007) ("[t]o hold otherwise would make [the insurer] a de facto party to a corporate contract and require it to pay the full contract price (plus interest), letting the corporation completely off the hook."); American Casualty, 942 P.2d at 176-77 ("To hold otherwise would allow an insured to turn all of its legal liabilities into insured events by the intentional act of refusing to pay them.").  These policy considerations do not apply where, as here, the parties intended for the Policies to cover breaches of express or implied

covenants, the failure or refusal to compensate, or "[a]ny other employment-related act, omission, policy, [or] practice."

### B.    The Policies' Exclusions

Under Georgia law, an insurer has the burden to prove that an exclusion to coverage applies.  See, e.g., Dolan v. Auto Owners Ins. Co., 773 S.E.2d 789, 792 (Ga. Ct. App. 2015).  Any coverage exclusions "must be defined clearly and distinctly."  State Farm Fire & Cas. Co. v. Walnut Ave Partners, LLC, 675 S.E.2d 534, 537 (Ga. Ct. App. 2009).  Exclusions invoked by an insurer are "'narrowly and strictly construed against the insurer and forgivingly construed in favor of the insured to afford coverage.'"  Liberty Surplus Ins. Corp. v. Norfolk S. Ry. Co., 684 F. App'x 788, 791 (11th Cir. 2017) (quoting Auto-Owners Ins. Co. v. Neisler, 779 S.E.2d 55, 59 (Ga. Ct. App. 2015)).  "If a policy exclusion is unambiguous, however, it must be given effect even if beneficial to the insurer and detrimental to the insured."  Kovacs v. Cornerstone Nat. Ins. Co., 736 S.E.2d 105, 107 (Ga. Ct. App. 2012) (citation omitted).  Three of the Policies' exclusions are at issue here.[10]

---

[10]    In its Complaint, National argued that three exclusions apply to preclude coverage: Exclusions A, H, and S.  In its motion for summary judgment, National only raises Exclusion H.  Further, in response to the County's motion for summary judgment, National argues that Exclusions A and S apply.  The Court will analyze all three Exclusions.

The Policies do not apply, and National shall not be liable or pay loss, for any:

A.   Obligation in which any insured may be held liable under any applicable workers' compensation law, unemployment compensation law, disability benefits law, or any similar law;

. . .

H.   Liability arising out of [the County's] "wrongful act" for gain, profit, or advantage to which you are not legally entitled;

. . .

S.   Liability arising out of, based upon or attributable to any actual or alleged violation of the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and any amendments thereto, or any similar foreign, federal, state or statutory law or common law.

([1.1] at 15-16, 18-19).

None of the laws or statutes listed in Exclusions A or S are at issue in the Pay Parity Cases. National argues that the Georgia Civil Service Act of 1982 (the "Civil Service Act"), or the Personnel Regulations enacted thereunder, are "similar" to the statutes or categories of statutes listed under either Exclusion A or Exclusion S such that they fall within the catchall clauses in the exclusions.

Under Georgia law, words in an insurance policy "generally bear their usual and common" meaning. O.C.G.A. § 13–2–2(2); see also Duckworth v. Allianz Life Ins. Co. of N. Am., 706 F.3d 1338, 1343 (11th Cir. 2013). Black's Law

Dictionary defines "similar" as "[n]early corresponding; resembling in many respects; somewhat like; having a general likeness." Black's Law Dictionary 1554 (4th Ed. 1968). Merriam Webster dictionary defines "similar" as "having characteristics in common, strictly comparable; alike in substance or essentials, corresponding." Merriam–Webster's Collegiate Dictionary 1093 (10th Ed. 1999).

National argues that under Exclusion A, the Civil Service Act and the Personnel Regulations are similar to "workers' compensation law, unemployment compensation law, [or] disability benefits law." The Court disagrees. The Court of Appeals of Georgia described the Civil Service Act as follows:

> In 1982, the General Assembly passed a law revising the Fulton County civil service system, the express purpose of which was to establish "a high quality merit system of personnel administration based upon accepted merit principles and recognized methods governing the appointment, promotion, transfer, layoff, removal, discipline, and well-being of employees who are governed by this Act, and for related personnel actions associated with Fulton County employment." Ga. L. 1982, pp. 4896–4897, § 1. Consequently, pursuant to the Civil Service Act, the County implemented a comprehensive set of "Personnel Regulations" that are vested with the "force and effect of law" to create a civil service merit system wherein the County's Personnel Director must develop a "Position Classification Plan" for all positions "based upon similarity of duties performed and responsibilities assumed so that comparable qualifications may reasonably be required for and the same schedule of pay may be equitably applied to all positions in the same class." PR 200–1.

Fulton Cty. v. Andrews, 773 S.E.2d 432, 434 (Ga. Ct. App. 2015).

Workers compensation laws exist to compensate employees for physical injuries sustained in the workplace.  See, e.g., Hadsock v. J.H. Harvey Co., 442 S.E.2d 892, 894 (Ga. Ct. App. 1994) ("One of the purposes of the [Workers' Compensation] Act is surely the humanitarian one of providing relief to injured employees, but another purpose is to protect employers against excessive recoveries of damages.").  Unemployment compensation laws seek to alleviate the "economic insecurity due to unemployment."  O.C.G.A. § 34-8-2.  Disability benefits laws are intended to benefit the disabled.  The Civil Service Act is simply not similar to workers compensation or unemployment or disability benefits laws.

National also argues that under Exclusion S, Georgia's Civil Service Act and Personnel Regulations are similar to the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the National Labor Relations Act, or any of the other statutes listed in Exclusion S.  National relies on only one section of the Personnel Regulations, which provides that all Fulton County employees, with certain exceptions, "shall henceforth be governed by the applicable provisions of the Fair labor Standards Act of 1938 (FLSA)."  ([45] at 8).  Reliance on this provision is nonsensical.  A regulation that the FLSA applies to certain County employees does not mean that the FLSA is similar in purpose and effect to the entirety of Georgia's Civil Service Act.  The Pay Parity Cases are not excluded by

Exclusion S.

National argues that Exclusion H applies because the Pay Parity Cases result from the County's "'wrongful act' for gain, profit, or advantage" to which it is not legally entitled. In the Policies, two provisions use the term "wrongful act." One is contained in the "employment practices wrongful act[s]" provision at issue here. The other is in the section entitled "Errors and Omissions Liability," which states that National will pay any "loss that [the County] become[s] legally obligated to pay on account of any 'wrongful act.'" ([1.1] at 8). That coverage provision is separate from the "Employment Practices Liability" coverage at issue here, and thus does not apply. From a plain reading of the unambiguous terms of Exclusion H, it does not apply to the Pay Parity Cases.

An exclusion invoked by an insurer is "'narrowly and strictly construed against the insurer and forgivingly construed in favor of the insured to afford coverage." National has not met its burden of showing that the Policies "clearly and distinctly" exclude the Pay Parity Cases under Exclusions A, H, or S.

C.     Notice

Under Georgia law, policy provisions which require the insured to provide prompt notice to the insurer of potential claims are common and have been held to be enforceable. See, e.g., Canadyne–Georgia Corp. v. Cont'l Ins. Co., 999 F.2d

1547, 1557 (11th Cir.1993); <u>South Carolina Insur. Co. v. Coody</u>, 957 F.Supp. 234, 237–38 (M.D. Ga. 1997); <u>Richmond v. Georgia Farm Bureau Mut. Ins. Co.</u>, 231 S.E.2d 245, 249-50 (Ga. Ct. App. 1976). "'The purpose of a notice provision in an insurance policy is to enable an insurer to investigate promptly the facts surrounding the occurrence while they are still fresh and the witnesses are still available, to prepare for a defense of the action, and, in a proper case, to determine the feasibility of settlement of the claim.'" <u>Owners Ins. Co. v. Gordon</u>, 315 F. App'x 146, 148 (11th Cir. 2008) (quoting <u>Coody</u>, 957 F.Supp. at 237).

"A requirement to give notice in a timely fashion is a condition precedent to recovery under an insurance policy." <u>Progressive Mountain Ins. Co. v. Simmons</u>, No. 4:13-CV-0033-HLM, 2014 WL 12513889, at *5 (N.D. Ga. Mar. 14, 2014) (citing <u>Cotton States Mutual Ins. Co. v. Int'l Surplus Lines Ins. Co.</u>, 652 F. Supp. 851, 856 (N.D. Ga. 1986)). Where an insured has not demonstrated sufficient justification for failure to give notice in accordance with such provisions, the insurer has no obligation to provide coverage. <u>Federated Mut. Ins. Co. v. Ownbey Enters.</u>, 627 S.E.2d 917, 919 (Ga. Ct. App. 2006). Where, as here, notice "is made a condition precedent to the arising of any liability on the part of the insurer, [it] is a substantial right of defense which the insurer is entitled to raise and have adjudicated under the facts in a declaratory judgment action." <u>Bituminous</u>

Casualty Corp. v. J.B. Forrest & Sons, Inc., 209 S.E.2d 6, 9 (Ga. Ct. App. 1974) (citing "condition precedent" language in a no-action clause and concluding that timely notice was a condition precedent to coverage).

### 1. The Notice Provisions Are Not Ambiguous

The Policies contain three notice requirements relevant here. First, the County must notify National "as soon as practicable" of any "employment practices wrongful act . . . which may result in a claim or suit that may exceed fifty percent (50%)" of the retained limit, i.e. $1,000,000. ([1.1] at 20). Next, the Policies state that "[i]f a 'claim' is made against the 'insured'" the County must notify National "as soon as practicable." This notice requirement is not qualified by a dollar amount. Id. Third, the Policies require "written notice as soon as practicable" of certain "Special Serious Claims," including all employment practices wrongful acts or claims in which, in the County's or its counsel's judgment, its exposure "exceeds or may exceed fifty percent (50%) of the 'retained limit'; [or] . . . [a]ny demand or demands that equal or exceed fifty percent (50%) of the 'retained limit.'" Id.

The Court finds that these provisions are consistent and not ambiguous, including because each contains a different trigger. The first requires notice of employment practices wrongful acts that "may" result in a claim that could exceed

$1,000,000. The next requires notice of any *claim* (including a lawsuit) that is asserted against the County, regardless of a projected dollar amount. The third requires notice of certain enumerated "Special Serious Claims," including employment practices wrongful acts and claims, which may exceed $1,000,000.

### 2. The Parties' Motions Regarding Notice

The Court next considers the Parties' cross-motions regarding whether the County provided proper notice to National. The Polices require the County to notify National "as soon as practicable" when a claim is made against it. ([1.1] at 20). National also has the right "to associate with [the County] in the investigation, defense, or settlement of any . . . claim for any . . . employment practices wrongful act" and to approve the County's selection of defense counsel. (Id. at 8). The Policies also provide that "[n]o action may be taken against [National] unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy." ([1.2] at 21).

The Policies provide the following instructions as to how to report a claim:

**CLAIM REPORTING
INFORMATION**

. . .

Our commitment to you is to provide fast, fair claim service. Promptly reporting an event that could lead to a claim, as required by your policy, helps us fulfill this commitment to you. Please refer to your policy for this and all other terms and conditions.

To report a claim, you may contact the Scottsdale Insurance Group 24 hours a day, 7 days a week, by calling 1-800-423-7675 or via our Web site at www.scottsaleins.com.

. . .

## HOW TO REPORT A CLAIM

Call 1-800-423.7675 or visit our Web site at www.scottsdaleins.com

In order to expedite this process, please be prepared to furnish as much of the following information as possible:

- Your policy number
- Date, time and location of the loss/accident
- Details of the loss/accident
- Name, address and phone number of any involved parties
- If applicable, name and law enforcement agency or fire department along with the incident number

Please refer to your policy for specific claim reporting requirements.

([1.2] at 5 (the "Reporting Instructions")).

The parties disagree as to which acts constitute notice. The County argues that it notified National of the then-pending Pay Parity Cases at the time of the underwriting and renewal of the 2013 Policy by virtue of the information contained in the Internal Runs. National argues that notice by the Internal Runs was improper, incomplete, and untimely, and that proper notice did not occur until the Willis Group's letter of March 9, 2015, disclosing the Benson case ([37.8]; [37.14]), and the August 4, 2015, letter notifying National of Andrews, Allen,

Bigelow, Chouhan, DeFoor, Lord, and Manchel, ([37] at 62-65).

a.    Notice by the Internal Runs

Fulton County argues that the undisputed facts show proper notice was given by the disclosures made to Civic Risk during the 2013 and 2014 underwriting and renewal process.  ([35.1] at 21-22).  The evidence is undisputed that Civic Risk acted as the underwriter for the 2013 Policy, and reviewed the County's application materials, including the Internal Runs, on behalf of National.

The County argues without authority that because Civic Risk was National's agent, notice to Civic Risk constitutes notice to National.  This they argue even though the Policies state that claims could be reported to Scottsdale Insurance Group.[11]  National argues and offers record evidence that Civic Risk served only as National's agent to handle underwriting, and had no role in handling claims. ([34.1] at 59:10-17).  The County admits that Civic Risk did not provide its applications containing the Internal Runs to National.  The facts regarding the relationship between Civic Risk and National are unclear and whether notice to Civic Risk constituted notice to National does not provide a basis to grant summary judgment to the County.

---

[11]    Allowing claims to be reported to Scottsdale does not mean this was the only way to make a claims report.

Even if notice to Civic Risk was sufficient to put National on notice, the undisputed facts show that the Internal Runs only indicated a subset of the Pay Parity Cases. The Internal Runs identified only the Allen, Andrews, Bigelow, DeFoor, and Manchel cases. ([34.8] at 4; [34.16] at 11-12, 14, 37, 40; [34.18] at 3-5). The Internal Runs did not identify Benson even though the Benson grievance was filed on April 6, 2012, and the lawsuit was filed on August 13, 2014.[12] The County does not argue that it gave notice to National of Benson. Instead, it appears to lump together all of the Pay Parity Cases such that notice of some suffices as notice of all. The County fails to establish that the brief reference to a subset of the Pay Parity Cases in historical loss runs constitutes timely and sufficient notice under the Policies.

Furthermore, the Internal Runs do not properly apprise National of the facts of the claims in order to participate in their defense, as contemplated by the Policies. The Policies require notice "as soon as practicable" of any claims and the County must provide "as much of the following information as possible" including policy numbers, details of the loss, and names, addresses, and phone numbers of involved parties. ([1.2] at 5). This is to enable National to investigate promptly

---

[12]     The Internal Runs did not identify Chouhan, because the Chouhan grievance was not asserted until July 28, 2015. ([36.5]).

the facts surrounding the claims while they are still fresh and the witnesses are still available, and to prepare for a defense or settlement of the action.  See Owners Ins. Co. v. Gordon, 315 F. App'x 146, 148 (11th Cir. 2008).  While a policy may allow notice of certain covered matters by loss runs, see, e.g., Evanston Ins. Co. v. Centennial Healthcare Corp., No. 1:05-CV-2012-WSD, 2007 WL 2071533, at *5 (N.D. Ga. July 12, 2007), the Polices here contain no such provision.  Instead, the Policies contemplate that the County will provide detailed information about a reported claim.  (See [1.2] at 5).  The Internal Runs were intended to provide historical information for the purpose of the underwriter's evaluation of past claims to assess future risk, not to apprise National of claims in the future.  The Internal Runs were never submitted to National and the underwriter did not have a role in handling claims.  The Internal Runs thus do not constitute formal notice under the Policies.

That there are disputed facts concerning the nature and timeliness of any "notice" given is supported by evidence relied on by National.  The July 11, 2013, Risk Management Memo sent by the County's Risk Management Department to the Willis Group stated that "the issues [in DeFoor, Andrews, Bigelow, and Manchel] most likely fall within the reporting period of our expiring carrier, C.V. Starr. . . . The Risk Manager does not view these matters as falling within the

purview of our new excess carrier." (PSOMF ¶ 31). This is inconsistent with the County's argument that it provided effective notice under the Policies of the Pay Parity Cases, considering that its own representatives did not believe the cases were covered under the Policies.

This finding is consistent with other court's decisions stating that loss runs fail to properly notify an insurer of its obligations to defend or indemnify. See, e.g., Steadfast Insurance Co. v. Sentinel Real Estate Corp., 727 N.Y.S.2d 393, 400 (N.Y. App. Div. 2001) (rejecting argument that a loss run spreadsheet constituted effective notice due to the hundreds of claims included in the list and the lack of information as to which claims the insured intended to tender to the insurer); Ins. Co. of Pennsylvania v. City of San Diego, No. 02-CV-0693 BEN (CAB), 2008 WL 11338593, at *3 (S.D. Cal. Mar. 14, 2008) (loss runs did not provide notice under policy, constructive notice, or actual notice including because "the loss runs were submitted for underwriting purposes, not as notice of a claim"). The County's motion for summary judgment regarding National's notice arguments is denied.

b.      Notice by Correspondence

National concedes that proper notice for Benson was made on March 9, 2015, via email correspondence from the Willis Group to a National

representative that included such details as the policy numbers, detailed

information about the plaintiffs' claims and dates of the incidents, and copies of

the Benson complaint. ([37.8]). National also concedes that notice of Andrews,

Allen, Bigelow, DeFoor, Manchel, and Lord, was finally made on July 27, 2015,

(PSOMF ¶ 57; [37] at 62-63).[13] David Simmons, a claims advocate at the Willis

Group, testified that he was unaware of any notice of the Pay Parity Cases

provided to National prior to March 9, 2015. ([372] at 79:14-16). The County

does not argue that it provided National with formal notice other than the Internal

Runs. For that reason, the question is whether notice of those Pay Parity Cases on

those dates was timely as a matter of law.

Under Georgia law, a notice provision which is made a condition precedent

to coverage is valid, and where an insured has failed to demonstrate sufficient

justification for failure to provide notice in accordance with such notice provision,

the insurer is not obligated to provide coverage or a defense. Illinois Union Ins.

---

[13] The evidence shows that the County formally notified National of Andrews, Allen, Bigelow, Chouhan, DeFoor, Lord, and Manchel on August 4, 2015. ([37] at 62-63). National states that "[a] question remains whether notice was provided on July 27 or August 4, 2015. For purposes of this Motion only, [National] assumes notice was provided on July 27, 2015." (PSOMF ¶ 57 n.1). Viewing the evidence in the light most favorable to the County for purposes of National's motion, the Court will use July 27, 2015, as the date of notice.

Co. v. Sierra Contracting Corp., 744 F.Supp.2d 1349, 1351 (N.D. Ga. 2010).

"Generally, notice provisions are made a condition precedent to coverage so that insurers can be certain that they are given the opportunity to investigate the facts surrounding an incident promptly and to prepare a defense or settlement while the facts are still fresh and witnesses are still available." Id. Whether notice was given "as soon as practicable" is generally a question of fact to be determined by a jury according to the nature and circumstances of the individual case. Illinois Union Ins. Co. v. NRI Const. Inc., 846 F. Supp. 2d 1366, 1370 (N.D. Ga. 2012). But "when the undisputed facts would preclude recovery, the issue of notice becomes a question of law appropriate for disposition on summary judgment." Travelers Indemnity Co. of Conn. v. Douglasville Dev., LLC, No. 07–CV–410–JOF, 2008 WL 4372004, at *4 (N.D. Ga. Sept. 19, 2008).

Georgia courts have held that a delay of as little as three months between the filing of a lawsuit and notice to the insurer is unreasonable as a matter of law. N. River Ins. Co. v. Gibson Tech. Servs., Inc., 116 F. Supp. 3d 1370, 1378 (N.D. Ga. 2014), order amended on denial of reconsideration, No. 1:13-CV-01505-MHS, 2015 WL 11236554 (N.D. Ga. June 15, 2015) (citing Diggs v. S. Ins. Co., 321 S.E.2d 792 (Ga. Ct. App. 1984)). The Eleventh Circuit, interpreting an excess coverage contract, has held that a four-month delay between the lawsuit and the

date of notice was unreasonable under Georgia law, absent a valid excuse. State Farm Fire & Cas. Co. v. LeBlanc, 494 F. App'x. 17, 23 (11th Cir. 2012).

The following chart illustrates the dates on which the Pay Parity Cases were filed as well as the dates on which the County reported the cases for coverage:

| Case | Grievance | Case Filed | Notice Date | Delay[14] |
|------|-----------|-----------|-------------|-------|
| Lord | 2006 | 2010 (arbitration) | July 27, 2015 | 24 months |
| Andrews | January 2012 | Nov. 5, 2012 | July 27, 2015 | 24 months |
| Benson | April 6, 2012 | April 13, 2014 | March 9, 2015 | 11 months |
| Manchel | NA | Sep. 19, 2012 | July 27, 2015 | 24 months |
| DeFoor | NA | Oct. 16, 2012 | July 27, 2015 | 24 months |
| Bigelow | NA | Nov. 16, 2012 | July 27, 2015 | 24 months |
| Allen | NA | Oct. 25, 2013 | July 27, 2015 | 18 months |
| Chouhan | July 28, 2015 | NA | Aug. 4, 2015 | NA |

The Benson grievance was filed on April 6, 2012. ([36.1]). The Benson lawsuit was filed on August 13, 2014. Therefore, the County's duty to notify National ripened on August 13, 2014, at the latest. Yet the Willis Group did not formally notify National of Benson until March 9, 2015. ([37.8]; [37.14]).

The Allen case was filed on October 25, 2013. Bigelow was filed on November 16, 2012. In September 2013, the County's Risk Department recommended setting aside $750,000 for Bigelow. DeFoor was filed on October 16, 2012. Manchel was filed on September 19, 2012, and twelve new plaintiffs

---

[14] This column lists the amount of time from either the date of filing or the beginning of the 2013 Policy coverage period, whichever is shorter.

were added on July 14, 2014. In September 2013, the County's Risk Department recommended setting aside $600,000 for Manchel, and $750,000 for Bigelow. Andrews was initially filed on November 5, 2012. The County's internal assessments show that it was aware that the potential exposure "could reach upwards of 4 million dollars" after the Andrews court granted summary judgment to the plaintiffs in September of 2014. The County did not inform National of Andrews, Allen, Bigelow, DeFoor, and Manchel to National until July 27, 2015. ([37] at 62-65). It does not explain the 11 to 24 month delays or show the delays were justified.

The Chouhan grievance was filed on July 28, 2015. ([36.5]). The County presents no evidence that it provided notice to National of Chouhan, yet the record reflects that Chouhan was reported to National in the same August 4, 2017, correspondence that National concedes put it on notice of Andrews, Allen, DeFoor, Lord, and Manchel. (PSOMF ¶ 57). This notice was approximately one week after the Chouhan grievance was filed. For this reason, a fact issue remains regarding whether notice of the Chouhan claim was untimely.

Viewing these facts in the light most favorable to the County, the Court finds that a reasonable jury could not find that the County complied with its obligation to provide timely notice of the Andrews, Allen, Benson, Bigelow,

DeFoor, Lord, and Manchel cases. National's motion for summary judgment regarding the insufficiency of the County's notice is granted with respect to all of the Pay Parity Cases except the Chouhan claim. There remains an issue of fact regarding whether notice of the Chouhan case was proper and timely.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Fulton County, Georgia's motion for summary judgment [35] is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** because the Policies provide coverage for the Pay Parity Cases and no exclusion applies. It is **DENIED** because the County did not provide proper notice of the Pay Parity Cases to National, and because there is an issue of fact whether the County provided notice of the Chouhan claim.

**IT IS FURTHER ORDERED** that National Casualty Company's motion for summary judgment [36] is **GRANTED IN PART** and **DENIED IN PART**. It is **DENIED** because the Policies provide coverage for the Pay Parity Cases and no exclusion applies. It is **GRANTED** because the County did not provide proper notice of the Andrews, Allen, Benson, Bigelow, DeFoor, Lord, and Manchel cases, but **DENIED** because there is an issue of fact whether the County provided proper notice of the Chouhan claim.

**SO ORDERED** this 28th day of March, 2018.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE